IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 12, 2022

**DARRYL CLAXTON v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 13-02927      Chris Craft, Judge**

_____

**No. W2021-01240-CCA-R3-PC**

_____

The petitioner, Darryl Claxton, appeals the denial of his petition for post-conviction relief, which petition challenged his 2015 Shelby County Criminal Court Jury conviction of first degree murder, arguing that he was deprived of the effective assistance of counsel at trial. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and JOHN W. CAMPBELL, SR., JJ., joined.

Sharon Morales, Memphis, Tennessee, for the appellant, Darryl Claxton.

Herbert H. Slatery III, Attorney General and Reporter; Kayleigh Butterfield, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Byrd, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On March 27, 2015, a Shelby County Criminal Court Jury convicted the petitioner of first degree murder for the shooting death of the victim, Terry Johnson, on November 14, 2012. This court summarized the evidence in our analysis of the sufficiency of the convicting evidence:

Viewing the evidence in a light most favorable to the State in this case, we conclude that there was sufficient evidence for the jury to find that the [petitioner] acted with premeditation. About an hour before the shooting, Ms. Milam overheard the [petitioner] speaking with Mr. Shaw and others about killing someone for money. Ms. Milam and Ms. Webb

testified that the [petitioner] left Ms. Milam's apartment several minutes before the victim. The [petitioner] was in the breezeway when the victim left the apartment, and the shooting happened immediately after Ms. Milam closed her apartment door. Before he shot the victim, the [petitioner] said[,] "[D]on't say s* * * else to me, on the FAM[,]" and "I been [sic] [killing] motherf* * * * *s." Additionally, there is nothing in the record to indicate that the victim was armed; the [petitioner] ran from the scene of the shooting, disposed of the murder weapon immediately after the shooting, and it was never recovered; and the [petitioner] surrendered himself to the Greenbriar Apartments security guards within minutes of the shooting. . . .

        . . . .

        In this case, three eyewitnesses, Mr. Peete, Ms. Webb, and Ms. Malone, saw the [petitioner] shoot the victim multiple times. Ms. Webb was standing mere feet from the victim when he was shot, and she testified that there was "no doubt in [her] mind" that the [petitioner] was the shooter. Further, Ms. Webb and Ms. Malone identified the [petitioner] as the shooter in a photo lineup within hours of the offense. Ms. Milam also overheard the [petitioner] speaking with others about the possibility of killing someone for money. . . .

*State v. Darryl Claxton*, No. W2015-00885-CCA-R3-CD, 2016 WL 1615648, at *7-8 (Tenn. Crim. App., Jackson, Apr. 20, 2016) (seventh through tenth alterations in original).

        Our supreme court denied the petitioner's application for permission to appeal on September 23, 2016, and, in April 2017, the pro se petitioner filed a timely petition for post-conviction relief, alleging, among other things, that he was deprived of the effective assistance of counsel at trial. Following the appointment of counsel, the petitioner filed two amendments to his petition for post-conviction relief that further refined his claims of ineffective assistance of counsel.

        At the evidentiary hearing, the petitioner testified, as is relevant to this appeal, that he met trial counsel in court but "not often" and that trial counsel visited him at the jail only two times during the time his case was pending in the trial court. He could not recall whether an investigator worked on his case. The petitioner said that he and trial counsel did "not often" speak about the case and that he did not ever discuss the facts of

-2-

the case with counsel. The petitioner testified that he did not ask his counsel any questions about the case and that he could not recall whether he had received the discovery materials in his case.

The petitioner maintained that trial counsel "took advantage of him" when she told him that he "cannot take the stand for my first time" because "I had a history of some robbery charges." He said that counsel "told me the wrong things" that prevented him from taking "the stand to give them my point of view." The petitioner claimed that the robbery charges at issue had been dismissed before his trial in this case. He said that he "tried to" tell trial counsel that he wanted to testify, but trial counsel advised him not to testify. He insisted that his decision not to testify was based solely on counsel's advice that he not do so. He claimed that his testimony "might have been different for the jury to probably know a better picture." The petitioner said that he attended special education classes in school and that he "notified" trial counsel of his learning difficulties, "but she -- some things she didn't want to hear. She ignored it." He said that his testimony at trial would have touched on these issues.

The petitioner testified that he asked trial counsel about forensic testing of the clothing he was arrested in given that he was arrested shortly after the shooting. He said that trial counsel told him, "It doesn't matter." He maintained that forensic testing would have made a difference in his case.

During cross-examination, the petitioner admitted that he had previously been convicted of misdemeanor drug offenses in the general sessions court but claimed that trial counsel did not explain that those offenses could have been used to impeach him had he elected to testify. The petitioner insisted that trial counsel did not tell him she would have been required to disclose to the State the results of forensic testing on his clothing.

Trial counsel testified that after she was appointed to represent the petitioner, she met with him 15 times at the jail and seven times "in lockup" when he was awaiting a court appearance. She said that the two discussed the facts of the case and that she "provided him not one but two copies of discovery, because he lost his first copy." She said that they "went through that discovery," discussing each of the potential witnesses for the State as well as any potential defense witnesses. She procured the services of an investigator who went with her to visit the petitioner at the jail.

Trial counsel testified that she "[a]bsolutely" told the petitioner that he would be sentenced to life if convicted at trial. She said that she provided him the statutory definitions of each of the homicide offenses and explained the potential sentences for each just before the trial. She also discussed the petitioner's mental limitations prior to trial and even "had a psychologist appointed." Trial counsel accompanied the psychologist "on the

first [visit] to introduce them so that he knew who she was, that she was part of the defense team." On the "second or third visit," however, the petitioner "acted like he had never met her. He didn't know if the sky was purple or was black or anything." Ultimately, the psychologist determined "that he was feigning intellectual limitations, and that she could, in fact, not complete her testing, because he was presenting as though he were so limited." Because of the petitioner's actions, counsel "was not in a position to pursue those intellectual limitations." Counsel concluded that the petitioner "frankly, was playing games, and thought that, well, I am going to make this report look really good as though he presented that he was a drooling idiot, which he is not." She recalled that the petitioner's mother agreed "that he may, in fact, be playing games with the psychology aspect of our investigation."

Trial counsel testified that she discussed with the petitioner his right to testify at trial. She added that she "had an opinion about it, and I have concerns that [the petitioner] may not have benefited his own case," but maintained that she "did not tell [the petitioner] to testify or not to testify." Instead, she said that she would have likely given him her opinion that he should not testify because "he would have been very easily led around by" his "tendency to get stuck on little things" during "cross-examination not to his benefit." Trial counsel testified that she would never have misinformed the petitioner about what part of his criminal record could have been used to impeach him had he elected to testify. She said that after having practiced criminal law for 28 years, she was "pretty confident that I identified prior convictions that would have qualified for impeachment and ones that did not, but I did not tell him he can't testify."

Trial counsel recalled that she and the petitioner "thoroughly discussed" having his clothing tested for gunshot residue. She said that the discovery materials indicated that the shooter had been wearing "a jacket that was taken off." She did not pursue gunshot residue testing on the petitioner's clothing because "[t]hat jacket would have had the residue on it, not [the petitioner's] clothes." She added, "So there was nothing for me to test." Trial counsel, observing that the State had not performed gunshot residue testing, stated that she was concerned that "if the gun residue test established there was anything on [the petitioner's] clothes, that just further puts him on the scene and standing there with the gun." Counsel maintained that gunshot residue testing "could not have helped him, it would have hurt."

During cross-examination by the State, trial counsel testified that she had handled 20 to 30 major felony cases, including a number of murder cases and some capital cases, during her more than 20-year career. Trial counsel said that, in lieu of seeking gunshot residue testing on the petitioner's clothing, which might have inadvertently bolstered the State's case, she elected to challenge the State's failure to conduct gunshot residue testing "in an effort to show that this was shoddy investigation by law

-4-

enforcement." She added, "Strategically it was better to be in a position . . . to attack the lack of the investigation and how they pursued their investigation and why they failed to conduct the gun residue testing."

At the conclusion of the hearing, the post-conviction court took the matter under advisement. The post-conviction court later denied post-conviction relief in a written order. In the order, the post-conviction court found "the petitioner's testimony to have been less than credible," observing that during his testimony at the evidentiary hearing, the petitioner "flatly contradicted himself[] and failed to remember basic facts about the preparation of his case." In contrast, the court found "the testimony of his attorney, a highly accomplished defense attorney who has tried multiple [m]urder [f]irst [d]egree cases, to be very credible." As to the petitioner's claim that trial counsel misled him about the potential that he could be impeached by his prior convictions, the post-conviction court accredited counsel's testimony that "she and the petitioner discussed his right to testify on more than one occasion, and she told him it was his decision alone as to whether or not he wished to testify." The court also accredited counsel's testimony that she would have been concerned about the potential for the petitioner to be "very easily led around . . . on cross-examination." The post-conviction court noted that the petitioner testified during the *Momon* colloquy that he was aware that he had a constitutional right to testify at trial and that he had personally elected not to do so. With regard to the petitioner's claim that trial counsel performed deficiently by failing to pursue gunshot residue testing of his clothing, the post-conviction court determined that counsel's decision to forego testing was a sound strategic decision made after adequate preparation. The post-conviction court also observed that the petitioner had failed to prove that he was prejudiced by counsel's decision because "no attempt was made to test the petitioner's clothes during the pendency of this petition" and "no proof was offered at the hearing on this petition that any testing of the clothes would have resulted in anything exculpatory."

In this timely appeal, the petitioner asserts that the post-conviction court erred by denying relief, reiterating his claims that trial counsel "failed to properly advise" the petitioner "about his right to testify" and that counsel performed deficiently by failing to seek gunshot residue testing of the clothing he was wearing at the time of his arrest. The State contends that the court did not err.

We view the petitioner's claim with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal

-5-

unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

Before a petitioner will be granted post-conviction relief based upon a claim of ineffective assistance of counsel, the record must affirmatively establish, via facts clearly and convincingly established by the petitioner, that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and that counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

The petitioner first asserts that trial counsel performed deficiently when advising him about the right to testify, claiming that he declined the opportunity to testify solely based on trial counsel's erroneous advice that the State would be permitted to impeach him with his criminal history if he did so. Trial counsel's accredited testimony, however, belies the petitioner's claim that she misadvised him with regard to the State's potential use of his criminal record. Instead, counsel testified that she communicated her opinion that the petitioner ought not testify, which was based upon her concern that the petitioner would not hold up well under cross-examination, but that she told the petitioner that the decision whether to testify was his alone to make. At the *Momon* colloquy, the petitioner testified that he had elected to "plead the 5th" after having thoroughly discussed his right to testify with trial counsel. Moreover, when given the opportunity at the evidentiary hearing, the petitioner did not indicate what his trial testimony would have been. Although he said that he believed the jury should have heard his "side of the story," he did not offer his side of the story at the evidentiary hearing. We cannot evaluate the impact of this absent testimony on the proof that was adduced at trial and, consequently, cannot conclude that there was a reasonable probability that the petitioner's testimony would have changed the outcome of the trial.

The petitioner also claims that trial counsel performed deficiently by failing to request gunshot residue testing of the clothing he was wearing at the time of his arrest. Counsel's accredited testimony established that she did not ask for gunshot residue testing

because she did not believe that gunshot residue testing of the clothing the petitioner was wearing would have yielded any useful results because other evidence established that the shooter was wearing a jacket that was later discarded. She also stated that she was concerned that gunshot residue testing might actually further implicate the petitioner by definitively placing the petitioner at the scene "with a gun in his hand." Instead, counsel chose to attack the lack of gunshot residue testing as part of her broader attack on the quality of the police investigation. Counsel's tactical decision, made after considerable thought and preparation, was a reasonable trial strategy. Additionally, the petitioner did not produce any evidence at the evidentiary hearing to establish that gunshot residue testing of his clothing would have yielded exculpatory evidence.

Because the record supports the denial of post-conviction relief, the judgment of the post-conviction court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE